UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BARBARA A. ROY, WILLIAM
GLENN ROY, III,

        Plaintiffs,

vs.

        Case Number 08-10217-BC
        Honorable Thomas L. Ludington

MICHIGAN CHILD CARE CENTERS, INC.,
ROBIN A. PAUL,

        Defendants.
_____/

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DISMISSING COMPLAINT WITH PREJUDICE

On January 15, 2008, Plaintiffs Barbara A. Roy and William Glenn Roy, III, filed a complaint against Defendants Michigan Child Care Centers ("MCCC") and Robin Paul ("Paul"), alleging the following counts: (1) breach of fiduciary duty against Paul, (2) conversion against both Paul and MCCC, (3) fraudulent concealment against both Paul and MCCC, and (4) accounting. Each of the causes of action, in one way or another, relate to a withdrawal of $188,451.29 in October 2004 from an MCCC investment account, created to fund a nonqualified deferred compensation plan, and its corresponding payment to an entity known as Mid-Michigan Child Care, Inc. ("Mid-Michigan"). Paul effectuated the withdrawal and its payment to Mid-Michigan. Plaintiff Barbara Roy was the sole participant in the plan, and Plaintiff William Roy, III, is the current trustee.

Even though the complaint includes language of "self-dealing" and conversion, it appears conceded by Plaintiffs that Paul never personally received the funds. While count III is labeled "fraudulent concealment,"the language actually refers to a legal doctrine by which the statute of

limitations may be tolled for the causes of action included at counts 1 and 2, rather than a separate cause of action. Similarly, an accounting is a remedy, rather than a separate cause of action. Plaintiffs' complaint seeks treble damages for Paul's "conversion" in count II and an accounting.

Now before the Court are Plaintiffs' motion for summary judgment [Dkt. # 18], filed on December 3, 2008, and Defendants' motion to dismiss and for summary judgment [Dkt. # 19], filed on December 5, 2008. In general, Plaintiffs' motion contends that Paul "transferred" $188,415.29 in violation of the deferred compensation plan and that Paul "is jointly and severally liable" for the sum received by Mid as a matter of law. Defendants' motion raises the threshold issue of whether Plaintiffs' claims are barred by the statute of limitations. On March 11, 2009, the Court directed the parties to submit supplemental briefing. While Defendants presented a plausible argument that Plaintiffs' claims are time-barred, the parties had not presented certain facts, which would likely be relevant to a determination of both the statute of limitations issue and the parties' motions generally.

Pursuant to the Court's directive, the parties submitted supplemental briefing [Dkt. # 29, 30] on April 15, 2009. The Court has reviewed the parties' submissions of record and finds that the facts and the law have been sufficiently set forth in the papers. The Court concludes that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, Defendants' motion to dismiss or for summary judgment will be granted because Plaintiffs' claims are barred by the statute of limitations. The Court will not reach the underlying merits of Plaintiffs' claims and Plaintiffs' motion for summary judgment will be denied.

I

The facts gathered from the parties' motions and supplemental briefs are as follows:

Plaintiff Barbara Roy is married to William G. Roy, Sr., and Plaintiff William Roy, III, is their grandson. Plaintiff Barbara Roy started a day care center in Midland, Michigan, in 1966. Her business grew to include twenty-seven day care centers in the Saginaw and Bay City area. To operate the day care centers, she eventually formed two non-profit organizations, Defendant MCCC in 1974 and Mid-Michigan in 1978. Currently, MCCC is the entity that manages the day care centers, while Mid-Michigan's purpose is to manage a Department of Agriculture food program in which MCCC participates. The food program is the Child Care Food Program, which is administered by the Michigan Department of Education.

The Restated Articles of Incorporation of MCCC, dated September 9, 1985, reflect that MCCC was organized on a "directorship" basis as well as a "stock-share" basis with ten shares having been issued. The bylaws for MCCC as well as the articles provide that the corporation was to be qualified under Internal Revenue Code § 501(c)(3) and that the corporation would not take any action that is not permitted to be carried on by a corporation formed and operated pursuant to § 501(c)(3). The articles reflect the following further covenant:

> No part of the asset of the corporation shall inure to the benefit of, or be distributable to, its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article 11 hereof.

While Plaintiffs contend that no stock was ever issued, board of director meeting minutes note the existence of a stock certificate for MCCC and that Plaintiff Barbara Roy and her first husband, William Herberg, were the original shareholders. Furthermore, an "agreement for purchase and sale of shares," dated September 1, 1987, identifies Plaintiff Barbara Roy as "the owner of all of the issued an outstanding shares of capital stock" of MCCC and Mid-Michigan, which consists of ten shares of common stock of each company.

While Plaintiffs state, without documentation, that until at least 1997, the boards of directors of MCCC and Mid-Michigan were identical, board of director and shareholder meeting minutes advanced by Defendants tell a different story. In the beginning, the three directors of MCCC were Plaintiff Barbara Roy, William Herberg, and Elaine Snook. From 1976 to 1979, Plaintiff Barbara Roy and William Herberg were the sole directors. By 1985, William G. Roy, Sr., had been elected as a director; Defendant Paul and Sandra Morrison also served as directors. It is not clear whether Plaintiff Barbara Roy and William F. Herberg were also directors at that time. By February 1987, Sandra Morrison was no longer a director. From then until November 1995, the three directors were Plaintiff Barbara Roy, William G. Roy, Sr., and Defendant Paul. In November 1995, Plaintiff Barbara Roy's son, William Herberg, III, replaced her on the board. He resigned from the board on August 31, 1997. Subsequently, Defendant Paul and other individuals unrelated to Plaintiff Barbara Roy have served on MCCC's board.

In contrast to the board of MCCC, the original board of directors of Mid-Michigan consisted of Sandra Morrison, Peter Poznak, Bruce Benway and Dana Mitchell. By August 1980, Agnes Varner replaced Dana Mitchell as a director. By 1981, minutes of a board meeting reflect that the board included Plaintiff Barbara Roy, Plaintiff Barbara Roy's father, Sandra Morrison, and Agnes Verner. In 1983, Sarah Berkley and Sandra Gyllenhammer replaced Peter Poznak and Agnes Varner as directors.

Minutes from an August 17, 1984, meeting of the shareholders identified Plaintiff Barbara Roy, William G. Roy, Sr., and Plaintiff Barbara Roy's father as shareholders of Mid-Michigan. The articles of incorporation of Mid-Michigan state that ten shares with a par value of $1.00 exist which allow each shareholder one vote. The minutes state that William G. Roy was appointed a director,

a restructuring was announced and, apparently, Plaintiff Barbara Roy sent letters to Bruce Benway, Sarah Berkley, Sandra Gyllenhammer, and Sandra Morrison, informing them that they were no longer directors of Mid-Michigan. According to September 9, 1985, shareholder meeting minutes, Plaintiff Barbara Roy, William G. Roy, Sr. and Plaintiff Barbara Roy's father were elected as directors.

It appears that Mid-Michigan's board consisted of Plaintiff Barbara Roy, William G. Roy, Sr., and Plaintiff Barbara Roy's father until November 15, 1995. Sandra Morrison appears to have served as a fourth director for one year beginning on February 21, 1987 and ending on February 20, 1988. From 1990 to November 15, 1995 Defendant Paul served as a fourth director. On November 15, 1995, Plaintiff Barbara Roy was replaced by her son William Herberg, III, as a director. William G. Roy, Sr., served notice that new directors would be elected at an August 31, 1997, shareholders' meeting. Board meeting minutes dated October 17, 1997, suggest that Plaintiff Barbara Roy, William G. Roy, Sr., and Plaintiff Barbara Roy's father no longer served as directors. New directors included Deborah Weadock, Mina Steklein, and presumably, Robin Paul, among others.

Plaintiff Barbara Roy served as president of Mid-Michigan until 1997. Plaintiff Barbara Roy's husband, William G. Roy, Sr., is an attorney and served as president of MCCC from 1987 to 1997. Up until 1997, Plaintiffs allege that Plaintiff Barbara Roy had the "overall responsibility . . . of managing the day care centers." Plaintiffs represent that Plaintiff Barbara Roy has never had an employment or consulting agreement expressly defining her role.

From 1997 to 2004, Plaintiffs maintain that Plaintiff Barbara Roy "continued in the leadership position she held with MCCC since she started the company." She also served as secretary-treasurer during this time. Plaintiffs allege that Plaintiff Barbara Roy did not receive any

compensation subsequent to 1997, although she continued to consult and help with the day care centers until 2004. Plaintiffs allege that since 2004, Plaintiff Barbara Roy has not performed any role with MCCC. Plaintiffs also allege that since 1997, William G. Roy, Sr., has had no involvement with MCCC.

Defendant Robin Paul began working for MCCC under Plaintiff Barbara Roy's direction in 1976, and it appears her primary role until 1997 was as a board member. In 1997, Paul replaced William G. Roy, Sr., as the president of MCCC and replaced Plaintiff Barbara Roy as president of Mid-Michigan. She also took on the primary responsibility of managing the day care centers, which Plaintiff Barbara Roy had done until that point. Beginning in 1987, it is contended that a "transfer of control" from Plaintiff Barbara Roy to Defendant Paul took place over a ten-year period that required payment of either $250,000.00 or $300,000.00 from Defendant MCCC to Plaintiff Barbara Roy at a rate of either $25,000 or $30,000 per year. Plaintiff Barbara Roy contends $30,000 per year; Defendant Paul contends $25,000. Plaintiffs allege that the payments were compensation, and not associated with the "transfer of control."

In their supplemental brief, Plaintiffs state that "[i]n terms of the day-to-day operations of MCCC, a transfer of control occurred in 1997." Despite the documentary evidence advanced by Defendants, Plaintiffs contend that MCCC was not a stock company, no shares of stock were ever issued for MCCC, no "sale" of MCCC ever occurred, and "no reportable event from an IRS perspective ever took place." Nonetheless, it appears that the purpose of the September 1987 "agreement for purchase and sale of shares" was to convert Plaintiff Barbara Roy's stock in MCCC and in Mid-Michigan to cash at a rate of $50,000 per year for ten years. Under the agreement, Paul would receive a five-percent stock interest each year for nine years, for a total of forty-five percent

stock interest in each corporation at the end of nine years. At the end of the tenth year, Paul was to receive the remaining fifty-five percent stock interest and "have total ownership rights and a full controlling interest" in both MCCC and Mid-Michigan. Defendants contend that while Paul is identified as the "buyer" in the transaction, money was actually paid to Plaintiff Barbara Roy by MCCC and Mid-Michigan. Consistent with the agreement, stock certificates dated August 31, 1997, indicate that Paul is the owner of one-hundred shares of capital stock of MCCC and one-hundred shares of capital stock of Mid-Michigan.

Meanwhile, in November 1991, Plaintiff Barbara Roy apparently moved to Florida. Around that time, she consulted with a Florida attorney, Howard Crown, about the "buy-out" of her interest in Defendant MCCC and the preparation of the deferred compensation plan that is the focus of this case. Attorney Crown's statement for professional services rendered specifically refers to reviewing a "buyout." On November 23, 1992, attorney Crown and William G. Roy, Sr., submitted a filing statement to the U.S. Department of Labor identifying the deferred compensation plan that had been adopted as an "unfunded top hat plan." The document appears to be executed by William G. Roy, Sr., as Defendant MCCC's president, and is attested to by Plaintiff Barbara Roy as its secretary. If there is any connection between the $250,000 or $300,000 payments for the "transfer of control," the putative "buy-out" about which Plaintiff Barbara Roy consulted attorney Crown, and the deferred compensation plan, it remains unexplained.

A few partial financial statements for Defendant MCCC are included at Exhibit L to Defendant's response for summary judgment [Dkt. # 21], which reflect funds being deposited to the deferred compensation plan. However, there are no employment or consulting agreements included with any of the papers or any specific explanation of what services Plaintiff Barbara Roy was

performing in late 1993 or thereafter to justify the compensation under the deferred compensation plan. The same partial financial statements also reflect a developing account liability or loan described as "Due to Mid-Michigan Child Care Centers, Inc." The entries reflect the following:

|  | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|
| **Assets** Investments and Deferred Compensation | $107,433 | $140,362 | $212,386 | $256,429 | $238,657 |
| **Liabilities** Mid-Michigan Child Care, Inc. loan | $3,782 | $0 | $71,000 | $222,000 | $300,878 |

While the balance sheet for Defendant MCCC reflects the fiscal year end balance for the deferred compensation plan, the parties papers do not reflect (1) what amount of money Plaintiff Barbara Roy deferred to the plan each year, (2) what amount of money Plaintiff Barbara Roy received each year from the plan, or (3) whether Plaintiff Barbara Roy received any other compensation during those years. While Defendants provided further financial statements with their supplemental brief, the financial statements do not answer these questions.

Exhibit L to Defendant's motion for summary judgment and brief in support [Dkt. #19] includes some additional portions of Defendant MCCC's financial statements. Of particular significance to the time period from 1994 to 1998 are copies of Note 2 to financial statements. The notes reflect promissory notes receivable from B. Roy and G. Roy, as follows:

|  | B. Roy | G. Roy |
|---|---|---|
| 1994<br>**Total** | $10,000<br>**$10,000** | $15,730<br>**$15,730** |
| 1995<br><br><br><br>**Total** | $10,000<br>$13,115<br>$17,291<br>$18,778<br>**$59,184** |  |
| 1996<br><br><br><br><br>**Total** | $75,000<br>$10,000<br>$7,546<br>$9,999<br>$12,879<br>**$115,424** |  |
| 1997<br><br><br><br><br>**Total** | $230,200<br>$10,000<br>$1,564<br>$2,083<br>$6,433<br>**$250,280** |  |
| 1998<br><br><br>**Total** | $180,425<br>$45,200<br>$10,000<br>**$235,625** |  |

Later partial financial statements reflect further notes receivable from other borrowers from the deferred compensation plan, including Williamsberg, LLC ($176,991), Con-Pak Holding Co. ($45,200), Highland Park ($181,148), Praxis Packaging, LLC ($$47,894), and REI Group, Inc. ($75,000). In their supplemental brief, Plaintiffs explain that Williamsberg, LLC, and Highland Park were joint ventures involving apartment buildings with a CPA, Bill Bivens, in Colorado who put the properties together for investment. Plaintiffs explain that Con-Pak Holding Co. was a joint venture with Plaintiff Barbara Roy and her son, William Herberg, Jr., and CPA Bill Bivens to purchase equipment. Plaintiffs state that Con-Pak eventually sold its interest to Praxis Packaging, who assumed the loan, but has since defaulted. With the exception of this loan, Plaintiffs contend that all other loans have been repaid.

In their supplemental brief, Plaintiffs explain that trustee Crown gave Plaintiff Barbara Roy

"full authority to make prudent investments of the money she deferred into the trust." Thus, Plaintiff contend that the "loans" were investments made in real estate, apartment buildings, and other properties, and funded by money Plaintiff Barbara Roy deferred in compensation. Plaintiffs allege that returns on investments were placed back into the trust, which accounts for the fact that the balance in the trust exceeded the gross contributions to the trust.

However, under Section 3.7(a) of the deferred compensation trust agreement, the assets of the trust fund are deemed to "constitute general unrestricted assets of the Company and shall be subject to the claims of creditors of the Company to the extent hereinafter set forth in this Section." Under Section 3.7(b), the company is obligated to notify the trustee if the company becomes "unable to pay its debts as they mature or that the Company has become subject as a debtor to a pending proceeding under the United States Bankruptcy Code." Under Section 3.7(c), the trustee must "suspend payments" under the trust upon receipt of "a written allegation . . . that the Company has become unable to pay its debts as they mature, or that the Company has become subject as a debtor to a pending proceeding under the United States Bankruptcy Code." And finally, under Section 3.7(d), the trustee is prohibited from making payments under the trust, upon receiving notice pursuant to subsections (b) or (c), except as directed by "a court of competent jurisdiction. . . to satisfy the claims of the creditors of the Company. . . ." The only income statement furnished to the Court was, as previously indicated, for the year ending December 31, 2004, which reflected a loss of $80,718.44. The balance sheet for the same year reflects negative retained earnings of $973,284.25.

Additionally, under Section 8.1, the trust fund is held by the trustee "for the exclusive benefit of the Executives and Surviving Spouses and for the benefit of the creditor of the Company pursuant

to Section 3.7. . . ." The section further states: "At no point prior to the complete satisfaction of all obligations to Executives and their Surviving Spouses under the terms of the Plan shall any part of the Trust Fund be used for or diverted to purposes other than for the exclusive benefit of the Executives and their Surviving Spouses." Paragraph six of the deferred compensation plan provides: "All amounts credited to an Account shall constitute general assets of the Corporation and may be disposed of by the Corporation at such time and for such purposes as it may deem appropriate."

Attorney Crown served as the original trustee and Plaintiff Barbara Roy was the only participant in the plan. At an unidentified point in time, Paul became the trustee at Plaintiff Barbara Roy's request. Then, on or about March 21, 2005, Plaintiff William Roy, III, became the trustee. Plaintiff William Roy, III, is an attorney and is still the trustee. The plan allows officers, defined as "employees," and directors to participate though only Plaintiff Barbara Roy utilized the benefit. Under the plan, deferrals by officers were limited to those requested in a signed writing submitted by an officer prior to the year in which deferrals are to be made, and are limited to an annual maximum of $16,260, unless the board of Defendant MCCC approves a greater amount in writing. The plan provides that a deferral amount "shall remain constant" unless suspended or another election is submitted.

There are only two signed deferrals in Defendant MCCC's records: (1) a deferral request dated February 10, 1992, purporting to take retroactive effect to the beginning of 1992 in the amount of $16,260 and (2) a deferral request dated November 20, 1992, in the amount of $6,000. The $6,000 deferral was never amended so it was to continue until retirement pursuant to paragraph 2 of the plan. Defendants contend that the February 10, 1992, deferral can have no force or effect because it pre-dated the adoption of the plan, and that it was at least replaced by the later $6,000

deferral request.

Thus, Defendants contend that under the plan, Plaintiff Barbara Roy could not have deferred more than $6,000 per year, beginning in 1992 and continuing until her retirement in August 1997. Defendants contend that the records reveal that far more was being "booked" in the plan accounts for the benefit of Plaintiff Barbara Roy than she was permitted to defer during the same period of time. For example, they emphasize that in 1991, before the plan was even adopted, Defendant MCCC held $22,551 in investments, including twenty-three shares of Dow Chemical stock. Within two years, Defendant MCCC's investments were transferred to the plan account.

In their supplemental briefing, Plaintiffs contend that Plaintiff Barbara Roy received the following amounts in compensation, and deferred the following amounts to the trust:

|  | "Take home pay" | "Deferred compensation" |
| --- | --- | --- |
| 1987 | unknown | unknown |
| 1988 | unknown | unknown |
| 1989 | unknown | unknown |
| 1990 | $28,499 | $1,501 |
| 1991 | $28,626 | $1,347 |
| 1992 | $27,015 | $2,985 |
| 1993 | $12,462 | $17,538 |
| 1994 | $27,519 | $2,481 |
| 1995 | $24,290 | $5,710 |
| 1996 | $2,960 | $27,040 |
| 1997 | $13,433 | $16,456 |

Significantly, Plaintiffs do not provide any documentation, W-2 forms or income tax returns, for example, to support these figures. As has previously been stated, despite the parties' wildly disparate accusations, the parties have not provided a coherent explanation of Plaintiff Barbara

Roy's compensation between 1994 and 2004, including the amounts that were deferred and the amounts that she received.

In 1994, as also earlier noted, Defendant MCCC began to borrow from Mid-Michigan in order to meet financial obligations, which, of course, would have included funding for Plaintiff Barbara Roy's deferred compensation. By September 1998, it is asserted that Defendant MCCC owed Mid $300,878. Plaintiffs state that they have no knowledge regarding the debt owed to Mid-Michigan.

According to Defendants, by fall 2004, Defendant MCCC was in serious financial trouble. The State of Michigan was conducting a scheduled audit of Defendant MCCC as part of its participation in the Child and Adult Care Food Program, and it threatened to disqualify Defendant MCCC for not being able to demonstrate financial viability. Defendant Paul testified that the State was concerned that the amount booked to the account for the benefit of Plaintiff Barbara Roy did not "smell right."

On October 11, 2004, Defendant Paul withdrew the $188,451.29 from "Atlas Funds," the financial house accounting for the trust investments and an account designated as a plan account for the benefit of Plaintiff Barbara Roy. Indeed, the transaction is noted in the September 30, 2005, financial statement that also reflects the loss of a note receivable from Praxis Packaging, LLC, in the amount of $47,984, and a $10,000 promissory note receivable from Plaintiff Barbara Roy. Defendant Paul testified in deposition that at the time she withdrew the funds, she thought "it would be paid back as a loan."

In their supplemental brief, Plaintiffs contend that the $188,451.29 was removed without the consent or knowledge of Plaintiff Barbara Roy. Plaintiffs contend that at an unidentified point in

time, Paul requested that Plaintiff Barbara Roy move the trust funds from Atlas Bank to Charles Schwab, claiming that she was having difficulty working with Atlas Funds. Paul then contacted Atlas Bank and instructed them to send her a check for the funds, instead of transferring the check to Charles Schwab. Plaintiffs contend that three months after withdrawing the funds, Paul called Plaintiff Barbara Roy and stated that the funds had not been placed in the Charles Schwab account, but were being used to pay MCCC's bills.

In December 2004, Defendants sent Plaintiff Barbara Roy a letter, stating:

> We will need to borrow from your deferred compensation plan to help with cash flow. This will be paid back to Rabbi Trust U/A DTD 11/92 with payments as soon as we are in a better financial position.
>
> We can discus the terms of payment and interest at that time.

Defendant Paul also sent Plaintiff Barbara Roy and her husband a holiday card stating, "I promise you will get your money."

On March 29, 2005, Defendant Paul sent an email to Plaintiff Barbara Roy stating, "You are correct, the $188,000 will need to be set up as a loan." On March 31, 2005, Plaintiff William Roy, III, sent a letter to Defendants stating that "[i]n the absence of a bankruptcy filing, [MCCC] has a contractual obligation to repay this amount to the Trust . . . . it is my opinion that this contractual liability must be reflected on the balance sheet." The letter further stated, "At some point, we will need to discuss how and when the contractual liability will be repaid." Plaintiff William Roy, III, also expressed his belief that "[u]nder the terms of the trust agreement, the Trustee is obligated to return those funds [to the company] only in the event that the company files bankruptcy or becomes insolvent."

In October 2005, William G. Roy, Sr., sent Defendant Paul a letter stating, "You are not

being honest with Barbara and me. Closing off communications will serve no purpose. . . ." Plaintiffs contend that significantly later, in summer 2007, Defendant Paul sent a handwritten note to Plaintiff Barbara Roy and her husband stating: "The only money that is owed back to Barb is Atlas Michigan Child Care. Set this up however you want in the form of a loan - I hope we can start to make payments soon." Defendants represent that Defendant Paul does not recall when the note was written.

Plaintiff William Roy, III, indicated on "note 3 " to a September 30, 2006, financial statement, that a "loan" should be paid back to the investment accounts by MCCC, but states that "there is doubt as to the collection of the amount due as no provisions for repayment have been made by the management of Michigan Child Care Centers, Inc."

II

If matters outside the pleadings are presented and not excluded by the court in a 12(b)(6) motion, the motion must be treated as one for summary judgment under Federal Rule of Civil Procedure 56. Fed. R. Civ. P. 12(d). Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record which demonstrate the

absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A fact is "material" if its resolution affects the outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).

### III

Generally, Plaintiffs contend in their motion for summary judgment that under the terms of the trust, specifically Section 8.1, trust assets may not be transferred to any party other than a trust beneficiary unless the trustee has become aware that the company is either insolvent or a bankruptcy debtor and the payment has been directed by a court of competent jurisdiction. Plaintiffs contend that neither condition was met when Defendant Paul transferred funds from the trust, and therefore the transfer is void and the funds must be restored. Plaintiffs also contend that Defendant Paul is personally liable because her conduct, as the trustee, was not taken in good faith.

Defendants, on the other hand, contend that the trust gave Defendant MCCC the discretion to utilize funds to pay claims of creditors necessary to its solvency and ability to proceed as a going concern. Defendants contend that Section 3.7 of the trust merely requires that in the event that a trustee receives formal notice of insolvency, the trustee will stop making payments under the plan

except as directed by a court of competent jurisdiction.  Defendants contend that Defendant MCCC had unfettered discretion to pay the claims of its creditors regardless of whether lawsuits are intiated or involuntary bankruptcy commenced.  Defendants also contend that Plaintiff Barbara Roy has already received more than she could be entitled to receive in distributions based on the terms of the plan.  Additionally, the threshold question of whether Plaintiffs' claims are barred by the applicable statute of limitations is raised in Defendants' motion.  As previously noted, the Court has received supplemental briefing relevant to this issue.  For the reasons stated below, Defendants are entitled to summary judgment on Plaintiffs' claims because they are barred by the statute of limitations.

In its order directing supplemental briefing, the Court determined that Plaintiffs' claims accrued on October 11, 2004, because "the wrong upon which the claim was based," Mich. Comp. Laws § 600.5827, Defendant Paul's withdrawal of funds from the trust account, occurred on that date.  Based on the three-year statute of limitations, which the parties agree applies to Plaintiffs' claims, the time to file claims would run on October 11, 2007.  The issue that remains to be addressed is whether Plaintiffs' claims were "fraudulently concealed" within the meaning of Mich. Comp. Laws § 600.5855.  The statute provides:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim . . . from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim . . . although the action would otherwise be barred by the period of limitations.

*Id.* § 600.5855.

Defendants' basic contention is that Plaintiffs' claims were not "fraudulently concealed" because Defendants notified Plaintiff Barbara Roy that the funds had been withdrawn in December 2004.  In contrast, Plaintiffs contend that their claims were fraudulently concealed because Paul

"repeatedly emphasized that the wrongly withdrawn funds would be paid back and even characterized the transaction as a loan in various financial books." In other words, Paul "consistently concealed her true intentions that she did not intend to repay the trust." Therefore, Plaintiffs contend that they had no reason to initiate collection until it "became apparent" that Paul would not repay the funds. Plaintiffs contend that they "finally came to the conclusion" that Paul would not repay the funds in summer 2007, and that they have two years from that time to file a suit.

Notably, in order to find that a claim was fraudulently concealed, § 600.5855 requires a showing that "the existence of the claim" is fraudulently concealed from the plaintiffs. In this case, Plaintiffs do not seriously contend that Paul concealed the fact that the funds were withdrawn from the trust. At most, the claims may have been "concealed" until December 2004, the time at which it is undisputed that Paul notified Plaintiff Barbara Roy that the funds had been withdrawn. However, accepting that the claims were fraudulently concealed until December 2004, does not extend the statute of limitations beyond October 11, 2007.

Instead, Plaintiffs argue that Paul fraudulently concealed the fact that she did not intend to repay the funds, by falsely stating that she had intentions to do so. Falsely expressing an intention to remedy a wrong does not, however, amount to concealment of the existence of that wrong. Defendants are entitled to summary judgment on Plaintiffs' claims because Plaintiffs' complaint was not filed within the statute of limitations. Consistent with this conclusion, the Court will not reach the underlying merits of Plaintiffs' claims and will deny their motion for summary judgment.

IV

Accordingly, it is **ORDERED** that Defendant's motion to dismiss or for summary judgment [Dkt. # 19] is **GRANTED**, and that Plaintiff's motion for summary judgment [Dkt. # 18] is

**DENIED**.

It is further **ORDERED** that Plaintiff's complaint [Dkt. # 1] is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: June 5, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 5, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS

---